Citation Nr: 1829929 
Decision Date: 11/09/18 Archive Date: 11/21/18

DOCKET NO. 11-25 082 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Cleveland, Ohio


THE ISSUES

1. Entitlement to service connection for sleep apnea, to include as due to an undiagnosed illness.

2. Entitlement to service connection for a left knee disability, to include as due to an undiagnosed illness.

3. Entitlement to service connection for a right knee disability, to include as due to an undiagnosed illness.

4. Entitlement to service connection for a right shoulder disability, to include as due to an undiagnosed illness.

5. Entitlement to service connection for hypertension, to include as due to an undiagnosed illness.



REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

S. Owen, Associate Counsel


INTRODUCTION

The Veteran served on active duty from November 1990 to July 1991, with additional service in the Army National Guard, including various periods of active duty for training (ACDUTRA) from March 1972 to July 1972, July 1973 to August 1973, May 1974, June 1975, May 1976, June 1976, August 1976, June 1977 to July 1977, July 1978 to August 1978, July 1979 to August 1979, September 1985, June 1986, May 1987, July 1987 to August 1987, August 1987, July 1988 to August 1988 and July 1989.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a July 2010 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Cleveland, Ohio, which, in pertinent part, denied service connection for a sleep disorder, skin rash, joint pain, muscle pain, chronic fatigue syndrome, diabetes mellitus, and hypertension.

In April 2012, the Veteran testified at a Central Office hearing at the Board's offices in Washington, D.C., before the undersigned Veteran's Law Judge. A transcript of the hearing is associated with the claims file. After the hearing, the Veteran submitted additional evidence and waived initial RO consideration. 

In March 2014, the Board remanded the case for further development of the record, including obtaining outstanding records and new VA medical opinions. There has been substantial compliance with the requested development. Stegall v. West, 11 Vet. App. 268 (1998); see Dyment v. West, 13 Vet. App. 141 (1999).

The Board notes that in its March 2014 decision, the claim for service connection for a skin condition was remanded. In a June 2016 rating decision, the RO granted service connection for tinea cruris, evaluated as noncompensable, effective from November 24, 2009. As the award of service connection is a grant of the benefit sought on appeal, the issue is no longer before the Board. See Grantham v. Brown, 114 F.3d 1156 (Fed. Cir. 1997) (noting that a grant of service connection extinguishes appeals before the Board).

This appeal was processed using the Virtual VA and Veterans Benefits Management System (VBMS) paperless claims processing system. Accordingly, any future consideration of this case should take into consideration the existence of this electronic record.


FINDINGS OF FACT

1. The Veteran's sleep apnea has not been shown to have been incurred in or related to service.

2. The Veteran's left knee disability has not been shown to have been incurred in or related to service.

3. The Veteran's right knee disability has not been shown to have been incurred in or related to service.

4. The Veteran's right shoulder disability has not been shown to have been incurred in or related to service.

5. Affording the Veteran the benefit of the doubt, his hypertension has been shown to have been related to or incurred in service or manifested within one year of separation from service. 


CONCLUSIONS OF LAW

1. The criteria for service connection for sleep apnea, to include as due to an undiagnosed illness, have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1117, 1118, 1131, 1137, 5103A (West 2014); 38 C.F.R. §§ 3.1, 3.102, 3.303, 3.304, 3.307, 3.309 (2016). 

2. The criteria for service connection for a left knee disability, to include as due to an undiagnosed illness, have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1117, 1118, 1131, 1137, 5103A (West 2014); 38 C.F.R. §§ 3.1, 3.102, 3.303, 3.304, 3.307, 3.309 (2016). 
 
3. The criteria for service connection for a right knee disability, to include as due to an undiagnosed illness, have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1117, 1118, 1131, 1137, 5103A (West 2014); 38 C.F.R. §§ 3.1, 3.102, 3.303, 3.304, 3.307, 3.309 (2016). 

4. The criteria for service connection for a right shoulder disability, to include as due to an undiagnosed illness, have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1117, 1118, 1131, 1137, 5103A (West 2014); 38 C.F.R. §§ 3.1, 3.102, 3.303, 3.304, 3.307, 3.309 (2016). 

5. The criteria for service connection for hypertension have been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1117, 1118, 1131, 1137, 5103A (West 2014); 38 C.F.R. §§ 3.1, 3.102, 3.303, 3.304, 3.307, 3.309 (2016). 



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), in part, describes VA's duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5103, 5013A, 5106, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2016). Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his or her representative of any information, and any medical or lay evidence, not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). VCAA notice should be provided to a claimant before the initial unfavorable agency of original jurisdiction decision on a claim. Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

The Veteran was advised of VA's duties to notify and assist in the development of the claim at issue by notice letter dated in December 2009. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2016); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015).

The VCAA also provides that VA has a duty to assist claimants in obtaining evidence needed to substantiate a claim. 38 U.S.C.A. § 5103A; 38 C.F.R § 3.159(c). Here, the Veteran's service records, VA records, and private treatment records identified by the Veteran have been obtained and associated with the claims file. The Board notes that the Veteran alleged during his April 2012 hearing that records were missing from his electronic record. The Veteran served on active duty from November 1990 to July 1991. He also had additional periods of service in the Army National Guard from December 1971 to December 1979 and from September 1984 to September 1991. Additional requests were made to obtain the missing records, and the outstanding records have been associated with the Veteran's claims file.

The Veteran was afforded VA examinations in May 2010, September 2014, January 2015, and June 2016. The examinations are of record. To that end, when VA undertakes to either provide an examination or to obtain an opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The VA examination reports reflect that relevant records were reviewed and the examiner personally interviewed and examined the Veteran, including eliciting a history from him, and offered opinions. 

The Veteran has been afforded a meaningful opportunity to participate effectively in the processing of the claim, including by submission of statements and arguments. Based upon the foregoing, the duties to notify and assist the Veteran have been met, and no further action is necessary to assist the Veteran in substantiating this claim.

Service Connection Laws and Regulations

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(a). Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

Service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). The U.S. Court of Appeals for Veterans Claims (Court) has held that "Congress specifically limits entitlement to service-connected disease or injury to cases where such incidents have resulted in a disability. In the absence of proof of a present disability, there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see also Rabideau v. Derwinski, 2 Vet. App. 141, 143-44 (1992).

In this case, hypertension is a chronic disease under 38 C.F.R. § 3.309(a); therefore, the presumptive service connection provisions based on "chronic" in-service symptoms and "continuous" post-service symptoms under 38 C.F.R. § 3.303(b) do apply. Fountain v. McDonald, 27 Vet. App. 258, 274-75; Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). 

Where the evidence shows a "chronic disease" in service or "continuity of symptoms" after service, the disease shall be presumed to have been incurred in service. For the showing of a "chronic" disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. With a chronic disease as such in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service-connected, unless clearly attributable to intercurrent causes. If a condition noted during service is not shown to be chronic, then generally, a showing of "continuity of symptoms" after service is required for service connection. 38 C.F.R. § 3.303(b). 

Additionally, where a veteran served ninety days or more of active service, and certain chronic diseases, such as hypertension, become manifest to a degree of 10 percent or more within one year after the date of separation from such service, such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137 (West 2014); 38 C.F.R. §§ 3.307, 3.309(a). While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time. Id. 

Under 38 U.S.C.A. § 1117(a)(1), compensation is warranted for a Persian Gulf Veteran who exhibits objective indications of a "qualifying chronic disability" that became manifest during service on active duty in the Armed Forces in the Southwest Asia Theater of operations during the Persian Gulf War, or to a degree of 10 percent during the presumptive period prescribed by the Secretary. Effective October 16, 2012, VA extended the presumptive period in 38 C.F.R. § 3.317(a)(1)(i) through December 31, 2016 (for qualifying chronic disabilities that become manifest to a degree of 10 percent or more after active duty in the Southwest Asia Theater of operations). See 77 Fed. Reg. 63225 (2012). Furthermore, the chronic disability must not be attributed to any known clinical disease by history, physical examination, or laboratory tests. See 38 U.S.C.A. § 1117; 38 C.F.R. § 3.317(a), (b).

Because the Veteran served in the Southwest Asia Theater of Operations from November 1990 to July 1991, he is a Persian Gulf veteran within the meaning of the applicable statute and regulation.

The law provides that active military service is active duty. This includes any period of active duty for training (ACDUTRA) during which the individual was disabled from a disease or an injury incurred in the line of duty. Active service also includes a period of inactive duty training (INACDUTRA) during which the Veteran was disabled from an injury incurred in the line of duty during such training. However, service connection is granted only for injuries, not diseases, incurred during inactive duty training. 38 U.S.C.A. § 101 (24); 38 C.F.R. § 3.6(a) (2016); see also VAOPGCPREC 86-90; Brooks v. Brown, 5 Vet. App. 484, 485-486 (1993). Further, ACDUTRA includes full-time duty performed by a member of the National Guard of any State under section 316, 502, 503, 504, or 505 of title 32, or the prior corresponding provisions of law. 38 U.S.C.A. § 101 (22); 38 C.F.R. § 3.6. INACDUTRA includes duty (other than full-time duty) performed by a member of the National Guard of any State, under 32 U.S.C. §§ 316, 502, 503, 504, or 505, or the prior corresponding provisions of law. 38 C.F.R. § 3.6(d)(4). Indeed, the Board points out that in accordance with 38 C.F.R. § 3.7(m), members of the National Guard are included in the Reserves.

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994); see also Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991) ("although interest may affect the credibility of testimony, it does not affect competency to testify").

Competent medical evidence is evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. It may also include statements conveying sound medical principles found in medical treatises. Competent medical evidence may also include statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159(a)(1). 

Lay assertions may serve to support a claim for service connection by establishing the occurrence of observable events or the presence of a disability or symptoms of disability subject to lay observation. 38 U.S.C.A. § 1154(a) (West 2014); 38 C.F.R. § 3.303(a); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); see also Buchanan v. Nicholson, 451 F.3d 1331, 1336 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability even where not corroborated by contemporaneous medical evidence). Lay evidence can be competent and sufficient to establish a diagnosis or etiology when (1) a lay person is competent to identify a medical condition; (2) the lay person is reporting a contemporaneous medical diagnosis; or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009). 

When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the veteran. See 38 U.S.C.A. § 5107 (West 2014); 38 C.F.R. § 3.102 (2016). 


Analysis

Sleep apnea

The Veteran contends that service connection is warranted for sleep apnea.

The Veteran testified at his April 2012 hearing that he first noticed he was having sleep problems in 1991. Due to the sleep problems, the Veteran experienced a sense of tiredness. The Veteran noted, however, that he had not been diagnosed with chronic fatigue syndrome. 

The Veteran reported in his June 1975, April 1988 and April 1991 physicals that he did not have frequent trouble sleeping. The Veteran also reported in his 1991 Southwest Asia demobilization/redeployment evaluation that he did not have any trouble sleeping or fatigue. 

The Veteran's private treatment records reflect that in November 1998, the Veteran complained of feeling tired. In 2003, he reported feeling tired all of the time. 

The Veteran was afforded a VA examination in May 2010. The examiner noted that the Veteran reported that he developed sleep problems in the early 1990s after returning from active duty. The Veteran reported that he did not have difficulty initiating sleep, but that he would wake up multiple times throughout the night. The Veteran reported that he was able to sleep 8 to 10 hours per night. The Veteran reported taking short naps, drinking one cup of coffee per day but no other caffeine consumption, and that he did not take any sleep medication. The examiner noted that the Veteran had not been diagnosed with any particular sleep disorder nor receiving any treatment for one. The examiner found that there was no clinical evidence to support a sleep disorder diagnosis at that time. However, the examiner noted that the Veteran had been diagnosed with coronary artery disease, and this was the cause of his claimed chronic fatigue. 

The Veteran was afforded a VA examination in September 2014. The Veteran stated that he was diagnosed with complex sleep apnea in 2008 after a sleep study; however, the examiner noted that the Veteran's electronic claims file and the 2010 VA examination report were silent on the issue. The examiner noted that the Veteran provided records from 2011 which referred to a previous diagnosis of complex sleep apnea, but that the dates of original diagnosis were not noted. The examiner noted that the Veteran's diagnosis of sleep apnea would explain his poor sleep pattern and fatigue, but that as sleep apnea has a clear pathology, the Veteran's sleep disability would not meet the criteria for Gulf War disease. 

In January, March and April 2015 examination reports, the examiner concluded that the Veteran's sleep apnea was less likely than not incurred in or caused by the claimed in-service injury, event, or illness, as there was no objective evidence of sleep apnea or related pathology in service, and that anecdotal historical evidence did not support an earlier diagnosis as stated. The examiner further noted that the Veteran's diagnosis in 2008 was clearly made several years after discharge from service. 

In a June 2016 examination report, the examiner concluded that the Veteran's claimed sleep disorder, currently diagnosed as complex sleep apnea, less likely than not began during active service or during any periods of ACDUTRA, or was otherwise related to any incident of service. The examiner considered the Veteran's statements that he never slept well and that he did not seek treatment for sleep problems while in service, but noted that there was no evidence of sleep apnea on physicals dated in June 1975, April 1988, and April 1991. 

The Board acknowledges that a claimant is generally competent to introduce lay testimony of observable symptoms of disability and continuity of such symptoms. Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). However, as a lay person, the Veteran is not competent to provide a medical diagnosis regarding the underlying cause of his sleep troubles; such a matter requires medical expertise and laboratory testing. See id. at 1377 (noting general competence to testify as to symptoms but not to provide medical diagnosis). As such, the Board finds the Veteran's representations in this regard to be of extremely limited probative value and significantly outweighed by the opinions expressed in the above compensation examination medical opinions.

For the reasons discussed above, a preponderance of the evidence is against the claim for service connection for sleep apnea. Because the preponderance of the evidence is against the Veteran's appeal, the benefit of the doubt doctrine is not applicable. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102 (2016).
 
Left knee disability

The Veteran contends that service connection is warranted for his left knee disability. Specifically, he states that his knee pain began during service and it has continued since service. 

The Veteran testified at his April 2012 hearing that he developed muscle and joint pain while in service, specifically in the knees and right shoulder. He could not attribute it to any specific injury during the Gulf War due to adrenaline rushes, but noted the aches and pains later when things had calmed down. The Veteran noted that the pain could be related to wear and tear of his duties working on vehicles and loading and unloading trucks while in service or due to environmental exposure while in the Gulf War.

The Veteran's June 1975, September 1984, April 1988 and April 1991 physicals reflects that he reported no arthritis, bone or joint deformity, or trick or locked knee.

The Veteran's private medical records reflect that he reported left knee pain in April 1996 due to a left knee injury incurred while bowling. The record reflects that the Veteran's physician noted that he had a left knee arthroscopy two years prior. 

In May 2010, the Veteran was afforded a VA examination for muscle and joint pain. The examiner noted that post-service in 2006, the Veteran reported that he started to develop muscle pain in his bilateral calves as well as his upper right thigh. A vascular study in 2007 revealed peripheral vascular disease of the lower extremities. The examiner noted that there was no inflammatory arthritis, no associated injuries to the muscles or specific joint pains and that there was full range of motion. 

The Veteran was afforded a VA examination in September 2014. The examiner noted that the Veteran was diagnosed with left knee torn meniscus post arthroscopy in 2008 and bilateral degenerative joint disease in 2014, with the right knee being worse than the left. The examiner noted that the Veteran's records reflected that he suffered a left knee injury in 1996 while bowling that was treated symptomatically. The Veteran reported having bilateral knee pain since the mid-2000s. The examiner found that the Veteran had slight degenerative changes in his left knee, with changes in x-rays likely a continuum of previously diagnosed entities, rather than being related to a Gulf War disease. 

In January, March and April 2015 examination reports, the examiner concluded that the Veteran's left knee disability was less likely than not incurred in or caused by the claimed in-service injury, event or illness. The examiner noted that even taking into consideration the reported 1994 arthroscopy and acute 1996 sprain, the current left knee pathology and subsequent diagnosis in 2008 did not start until several years after discharge from service. 

A June 2016 examination report reflects that the examiner concluded that the Veteran's left knee disability, currently diagnosed as left knee with torn meniscus, status post arthroscopy and degenerative joint disease of the knee, less likely than not began during active service or during any periods of ACDUTRA or INACDUTRA, or was otherwise related to any incident of service. Furthermore, the Veteran's degenerative joint disease less likely than not manifested within one year of the Veteran's separation from service. The examiner noted that the Veteran's June 1975, April 1988, and April 1991 physicals did not reflect a finding of a knee disorder. The examiner noted that the Veteran's private treatment records reflected that he sought treatment for left knee pain in April 1996 due to a bowling injury, and that the Veteran had had knee problems, with an arthroscopy in 1994. The examiner considered the Veteran's testimony during his April 2012 hearing, in which the Veteran related that his knee and shoulder issues were due to working on trucks and unloading trucks as an equipment operator in the Army, but that he did not seek treatment for it until he could hardly walk. 

The Veteran has stated that his knee pain began during service and has continued since service. The Board acknowledges that a claimant is generally competent to introduce lay testimony of observable symptoms of disability and continuity of such symptoms. Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). However, as a lay person, the Veteran is not competent to provide a medical diagnosis regarding the underlying cause of his left knee pain; such a matter requires medical expertise and laboratory testing. See id. at 1377 (noting general competence to testify as to symptoms but not to provide medical diagnosis). 

To the extent that the Veteran complained of left knee pain in service, pain itself is not a disability for VA purposes. The Veteran did not complain of an injury in service and his June 1975, April 1988, and April 1991 physicals were silent for complaints of a left knee condition or knee pain. The first report of a left knee condition is the 1994 arthroscopy, which occurred several years after service separation. A vascular study in 2007 revealed peripheral vascular disease of the lower extremities, with no inflammatory arthritis, no associated injuries to the muscles or specific joint. As such, the Board finds the Veteran's representations regarding his left knee disability being related to his time in service to be of extremely limited probative value and significantly outweighed by the opinions expressed in the above compensation examination medical opinions.

For the reasons discussed above, a preponderance of the evidence is against the claim for service connection for a left knee disability. Because the preponderance of the evidence is against the Veteran's appeal, the benefit of the doubt doctrine is not applicable. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102 (2016).

Right knee disability

The Veteran contends that service connection is warranted for his right knee disability. 

Specifically, the Veteran testified at his April 2012 that during weekend drills in 1980 while in the National Guard, he fell off of a truck and broke his leg. He further testified that he developed muscle and joint pain while in service, specifically in the knees and right shoulder, and that it has continued since service. He could not attribute it to any specific injury during the Gulf War due to adrenaline rushes, but noted the aches and pains later when things had calmed down. The Veteran noted that the pain could be related to wear and tear of his duties working on vehicles and loading and unloading trucks while in service or due to environmental exposure while in the Gulf War. 

A June 1975 physical reflects that the Veteran reported no arthritis, bone or joint deformity, or trick or locked knee. A September 1984 physical report reflects that the Veteran broke his right leg in 1980 and an April 1988 physical reflects that the leg had healed without sequalae. The Veteran's September 1984, April 1988 and April 1991 physicals reflects that he reported no arthritis, bone or joint deformity, or trick or locked knee.

The Veteran's private treatment records reflect that in November 2006, the Veteran complained of right leg soreness and that in February 2008, the Veteran sought treatment for his right knee giving way. 

In May 2010, the Veteran was afforded a VA examination for muscle and joint pain. The examiner noted that in 2006 after he was in the service, the Veteran reported that he started to develop muscle pain in his bilateral calves as well as his upper right thigh. A vascular study in 2007 revealed peripheral vascular disease of the lower extremities. The examiner noted that there was no inflammatory arthritis, no associated injuries to the muscles or specific joint pains and that there was full range of motion. 

The Veteran was afforded a VA examination in September 2014. The examiner noted that the Veteran was diagnosed with a right knee injury with torn ligament in 2006 and bilateral degenerative joint disease in 2014, with the right knee being worse than the left. The examiner noted that the Veteran's service treatment records reflected a right femur fracture in 1980, but that a 1991 physical showed no residuals. The Veteran reported having bilateral knee pain since the mid-2000s. The examiner found that the Veteran had a healed proximal fibular diaphyseal fracture deformity with mild to moderate degenerative changes at the knee with changes in x-rays likely a continuum of previously diagnosed entities, rather than being related to a Gulf War disease. 

In January, March and April 2015 examination reports, the examiner concluded that the Veteran's right knee disability was less likely than not incurred in or caused by the claimed in-service injury, event or illness. The examiner noted that the 1980 right distal femur fracture had no reported residuals on the Veteran's 1991 physical and that there was no evidence of manifestation of a right knee disability within one year of service and that the right knee diagnosis was not made until 2006, several years after discharge. 

A June 2016 examination report reflects that the examiner concluded that the Veteran's right knee disability, currently diagnosed as right knee with torn ligament and degenerative joint disease of the knee, less likely than not began during active service or during any periods of ACDUTRA or INACDUTRA, or was otherwise related to any incident of service. Furthermore, the Veteran's degenerative joint disease less likely than not manifested within one year of the Veteran's separation from service. The examiner noted that the Veteran's June 1975, April 1988, and April 1991 physicals did not reflect a finding of a knee disorder. On a physical dated in April 1988, it was noted that the Veteran had broken his right leg in 1980 without sequalae. The June 2016 found that this was a normal clinical evaluation, with the summary of defects reflecting none. The examiner considered the Veteran's testimony during his April 2012 hearing, in which the Veteran related that his knee and shoulder issues were due to working on trucks and unloading trucks as an equipment operator in the Army, though he did not seek treatment until 2006 when he could hardly walk.

The Veteran has stated that his knee pain began during service and has continued since service. The Board acknowledges that a claimant is generally competent to introduce lay testimony of observable symptoms of disability and continuity of such symptoms. Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). However, as a lay person, the Veteran is not competent to provide a medical diagnosis regarding the underlying cause of his right knee pain; such a matter requires medical expertise and laboratory testing. See id. at 1377 (noting general competence to testify as to symptoms but not to provide medical diagnosis). 

To the extent that the Veteran complained of right knee pain in service, pain itself is not a disability for VA purposes. The Veteran did suffer a right broken leg while in service; however, it was noted to have healed without sequalae. In addition, his June 1975, April 1988, and April 1991 physicals were silent for complaints of a right knee condition or knee pain. The first report of a right knee condition is in 2006, which was more than ten years after service separation. A vascular study in 2007 revealed peripheral vascular disease of the lower extremities, with no inflammatory arthritis, no associated injuries to the muscles or specific joint. As such, the Board finds the Veteran's representations regarding his right knee disability being related to his time in service to be of extremely limited probative value and significantly outweighed by the opinions expressed in the above compensation examination medical opinions.

For the reasons discussed above, a preponderance of the evidence is against the claim for service connection for a right knee disability. Because the preponderance of the evidence is against the Veteran's appeal, the benefit of the doubt doctrine is not applicable. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102 (2016).

Right shoulder disability

The Veteran contends that service connection is warranted for his right shoulder. Specifically, he stated during his April 2012 hearing that he experienced aches and pains in service and that it has continued since service. The Veteran stated that he could not attribute it to any specific injury during the Gulf War due to adrenaline rushes, but noted the aches and pains later when things had calmed down. The Veteran noted that the pain could be related to wear and tear of his duties working on vehicles and loading and unloading trucks while in service or due to environmental exposure while in the Gulf War.

The Veteran's June 1975, September 1984, April 1988 and April 1991 physicals reflects that he reported no arthritis, bone or joint deformity, or painful or trick shoulder.

The Veteran's private treatment records reflect that he sought treatment in October 2009 for right shoulder pain having lasted one year. 

In May 2010, the Veteran was afforded a VA examination for muscle and joint pain. However, there was no mention of a shoulder disability at that time.

The Veteran was afforded a VA examination in September 2014. The examiner noted that the Veteran was diagnosed with right shoulder osteoarthritis with spur in 2014. The Veteran reported that he had had pain in his right shoulder the last five to six years and that it hurt to lift or push, but that resting helped and that he had never seen a doctor for it. The examiner found that the Veteran's right shoulder pain was due to his right shoulder osteoarthritis, not Gulf War disease. 

In January, March and April 2015 examination reports, the examiner concluded that the Veteran's right shoulder disability was less likely than not incurred in or caused by the claimed in-service injury, event or illness. The examiner noted that there was no evidence of manifestation of a right shoulder disability within one year of service and that the right shoulder diagnosis was not made until 2014, several years after discharge. 

A June 2016 examination report reflects that the examiner concluded that the Veteran's right shoulder condition, currently diagnosed as right shoulder osteoarthritis, less likely than not began during active service or during any periods of ACDUTRA or INACDUTRA, or was otherwise related to any incident of service. Furthermore, the Veteran's osteoarthritis less likely than not manifested within one year of the Veteran's separation from service. The examiner noted that the Veteran's June 1975, April 1988, and April 1991 physicals did not reflect a finding of a shoulder disorder. The examiner considered the Veteran's testimony during his April 2012 hearing, in which the Veteran related that his knee and shoulder issues were due to working on trucks and unloading trucks as an equipment operator in the Army.

The Veteran has stated that his right shoulder pain began during service and has continued since service. The Board acknowledges that a claimant is generally competent to introduce lay testimony of observable symptoms of disability and continuity of such symptoms. Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). However, as a lay person, the Veteran is not competent to provide a medical diagnosis regarding the underlying cause of his shoulder pain; such a matter requires medical expertise and laboratory testing. See id. at 1377 (noting general competence to testify as to symptoms but not to provide medical diagnosis). 

To the extent that the Veteran complains of experiencing right shoulder pain, pain itself is not a disability for VA purposes. The Veteran's June 1975, April 1988, and April 1991 physicals were silent for complaints of a right shoulder condition. The first report of a right shoulder condition is in 2014, when the Veteran was diagnosed with osteoarthritis. This diagnosis came more than ten years after service separation. As such, the Board finds the Veteran's representations regarding his right shoulder disability being related to his time in service to be of extremely limited probative value and significantly outweighed by the opinions expressed in the above compensation examination medical opinions.

For the reasons discussed above, a preponderance of the evidence is against the claim for service connection for a right shoulder disability. Because the preponderance of the evidence is against the Veteran's appeal, the benefit of the doubt doctrine is not applicable. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102 (2016).

Hypertension

The Veteran contends that service connection is warranted for his hypertension. The Veteran stated that in the first few years after active duty, he had some issues but did not really consider them, as he thought it was a part of life. The Veteran testified that he had been having problems with his blood pressure and sought treatment for a blood pressure issue in February 1992. He stated that during 1991 and 1992, he was having his blood pressure checked on a daily basis at the nurse's station at the company he was working for, which no longer exists. See April 2012 hearing testimony. The Board notes that the record was left open after the hearing so that the Veteran could attempt to obtain and submit those records. However, the Veteran has not submitted the records for review.

The Veteran self-reported on his June 1975, September 1984 and April 1988 physicals that he had not had high or low blood pressure. However, on his April 1991 physical, he reported that he had or had had high or low blood pressure. However, there are no additional notes or explanations by either the Veteran or the examiner on the examination report. 

The Veteran's private treatment records reflect that he sought treatment for high blood pressure in August 1995 and was diagnosed with hypertension in September 1995. The August 1995 record reflects that he reported his blood pressure at work was 190/130. 

The Veteran was afforded a VA examination in September 2014. The examiner noted that the Veteran was not diagnosed with hypertension until 1997, and that an earlier April 1991 physical did not mention hypertension while a second April 1991 note merely questioned whether blood pressure was high and/or low. The examiner noted that the Veteran's blood pressure was now well controlled with metoprolol. The examiner diagnosed the Veteran with essential hypertension in light of the absence of secondary causes and concluded that the essential hypertension did not meet the criteria for Gulf War disease. 

In January, March and April 2015 examination reports, the examiner concluded that the Veteran's hypertension was less likely than not incurred in or caused by the claimed in-service injury, event or illness. The examiner noted that there was no evidence of manifestation of hypertension within one year of service and that the hypertension diagnosis was not made until several years after discharge. Specifically, that the Veteran was diagnosed and began treatment for high blood pressure in 1997 per the Veteran's medical records, and that anecdotal high or low blood pressure reported in 1991 could not be used as diagnostic criteria. 

A June 2016 examination report reflects that the examiner concluded that the Veteran's hypertensive disorder, currently diagnosed as essential hypertension, less likely than not began during active service or during any periods of ACDUTRA, or was otherwise related to any incident of service. Furthermore, the Veteran's hypertension less likely than not manifested within one year of the Veteran's separation from service. The examiner noted that the Veteran's June 1975, April 1988, and April 1991 physicals did not reflect a finding of hypertension. The examiner noted that no readings outside the normal range were documented during the Veteran's military service. Although the Veteran checked "yes" to history of high or low blood pressure, there was no explanation and no physician's comment on blood pressure in the April 1991 physical. The examiner considered that the Veteran stated during his April 2012 hearing that first sought treatment for high blood pressure in February 1992 but that the Veteran's private treatment records first indicated diagnosis of and treatment for high blood pressure in August/September 1995.

The Board notes that the September 2014 and January, March, and April 2015 examiners' opinions reflect that the Veteran was diagnosed with hypertension in 1997. However, the Veteran's medical records reflect that he was diagnosed with hypertension in 1995. As the examiners' opinions are based on an inaccurate premise, the Board finds that they carry less probative weight. 

The Board acknowledges the negative opinions given by the VA examiners. However, the Board finds that the evidence is at least in equipoise as to whether the Veteran began experiencing hypertension in service. The Veteran's service treatment records reflect a report of high or low blood pressure in 1991 and the examiner at the time failed to address this. Although the Veteran is not competent to give an opinion on the cause of the underlying symptomology of hypertension, the Veteran has credibly stated that he has experienced the symptoms of high blood pressure since service and began having his blood pressure checked by the nurse at work in 1992. Private treatment records reflect a report of a high blood pressure result at work in 1995 and that the Veteran then sought treatment for high blood pressure from his physician. Continuity of symptomology since service supports the chronicity of hypertension in or since service. 

For the reasons discussed above, and affording the Veteran the benefit of the doubt, a preponderance of the evidence is for the claim for service connection for hypertension. Therefore, service connection for hypertension is granted. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102 (2016).

ORDER

Service connection for sleep apnea, to include as due to an undiagnosed illness, is denied.

Service connection for a left knee disability, to include as due to an undiagnosed illness, is denied.

Service connection for a right knee disability, to include as due to an undiagnosed illness, is denied.

Service connection for a right shoulder disability, to include as due to an undiagnosed illness, is denied.

Service connection for hypertension is granted.





____________________________________________
K. PARAKKAL
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs